INSURORS INDEMNITY & INSURANCE COMPANY
v. MRS. MINNIE PRIDGEN ET AL.

No. A-2125. Decided July 20, 1949.
Rehearing overruled October 19, 1949.
(223 S. W., 2d Series, 217.)

*David Bland* and *Austin Y. Bryan, Jr.*, both of Houston, for petitioner, Insurors Indemnity and Insurance Company.

Both the trial court and the court of civil appeals erred in holding that Walter Lee Pridgen, the deceased, was an employee of the Texas Shipbuilding Company, for whom petitioner is the insurer, at the time of his death. They also erred in holding that said deceased was not an employee at the time of his death of the Texas Lumber and Construction Company or of the Sonnier Construction Company. Art. 8309, R. S. 1925; Shannon v. Western Indem. Co., 257 S. W. 522; Southern Underwriters v. Lloyds of Am., 133 S. W. (2d) 151; Tilling v. Indemnity Ins. Co. of N. A., 283 S. W. 565; Driscoll v. Towle, 181 Mass, 416, 63 N. E. 922.

*Putney & Ritchey* and *E. F. Richey*, all of Victoria, and *Walter F. Brown* and *H. Fletcher Brown*, both of Houston, for respondent, Mrs. Pridgen.

Where a general contractor loans his workmen to another and directs him to do certain work which is under the control of such other employer, and said workman continues under the employment of the general contractor who pays his compensation and has the full power to discharge him for his refusal to do the work for the special employer when so directed, the employee, if injured while engaged in such work may look to both employers and their respective insurance carriers for compensation. Wright v. Cane Run Petroleum Co. 262 Ky. 251, 90 S. W. (2d) 36; Famous Players Lasky Corp. v. Industrial Acc. Com. 194 Cal. 134, 228 Pac. 5; DeNoyer v. Cavanaugh, 221 N. Y. 273, 116 N. E. 992.

*F. Warren Hicks*, of Houston, for Traders & General Ins. Co.

*McGregor & Sewell* and *W. E. Junell*, all of Houston, for Texas Employers Ins. Assn.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

The only question for determination in this proceeding is which one or more of three Workmen's Compensation Insurance carriers, parties hereto, must respond for benefits concededly due under the statute to Mrs. Minnie Pridgen (the remaining party) as a result of the electrocution of her son, Walter Lee Pridgen, in the course of his employment in a position variously described as "helper, swamper or oiler" of a dragline. The latter is evidently a mobile apparatus which can dig, lift, and perform sundry other useful functions of heavy work by its own motive power and the deceased was the subordinate member of its crew of two, the other being his brother, A. O. Prigden, who was the "operator", controlling the power and movements of the machine and being the "foreman" of himself and the deceased. The accident happened on the premises of a ship construction and repair concern known as Texas Shipbuilding Company (hereafter called Shipyard), while the two Pridgens, by means of the dragline, were loading some heavy concrete slabs into a truck. In some manner the boom or lifting cable of the machine came into contact with an electric power line near which it was working, and Walter Lee Pridgen, who was on the ground and holding the cable, thus received a fatal shock.

Concededly both brothers were at all material times in the general employment of the owner of the dragline, L. O. Smith, doing business as Texas Lumber & Construction Company (hereafter referred to as Smith). However, their above-mentioned work was being done for the benefit of and at the expense and direction of Shipyard as a result of the following arrangements: The Shipyard needed some maintenance work on its plant premises, including enlargement of a slush pit, widening a slip, and removing the above-mentioned slabs. E. B. Zinnecker, President of Shipyard, thought he could best accomplish the work with a dragline and, the Shipyard having none, called Sonnier Construction Company, a construction contracting concern (hereafter called Sonnier), which had previously rented similar machines with operators to Shipyard. In this conversation Sonnier agreed to "lease" to Shipyard a "fully operated" dragline at a "rental" of $8.00 per hour for the actual number of hours the machine would be in operation. There was only very general discussion of the character or details of the work to be done. Sonnier was simply to have a fully operated machine "report to" Zinnecker at the Shipyard premises—presumably to there do such jobs as Zinnecker should direct. Sonnier did not then have a spare dragline available but, without telling Zinnecker this, proceeded to arrange verbally with L. O. Smith above-mentioned, who was in more or less the same line of business as Sonnier,

to lease from Smith at $7.00 per hour ($1.00 per hour less than Shipyard was to pay Sonnier) a fully operated dragline which Smith happened to have on hand unoccupied. It is not clear how far Sonnier disclosed to Smith its agreement with Zinnecker, but Sonnier did instruct Smith to have the dragline "report to" Zinnecker at the Shipyard premises, which evidently meant that Shipyard would tell the operator what to do when he reported. Accordingly, and upon instructions from Smith to the dragline "operator", A. O. Pridgen, the latter duly reported to Zinnecker with the dragline involved in the accident, manned by himself and Walter Lee Pridgen, and thereafter for some three days proceeded to do various jobs indicated by Zinnecker, including the final one in the course of which the accident occurred.

It should be noted that it is customary for contractors like Sonnier and Smith to lease out their otherwise unoccupied draglines and similar equipment on a "fully operated", hourly rental basis and that both parties named considered this practice as a normal, if perhaps subordinate, part of their business. It is also pertinent that the expression "fully operated" has an established meaning in the contracting business to the effect that: The owner of the dragline furnishes the machine and two men to operate it in the respective capacities occupied by the Pridgens as above-mentioned, carries the men on his payroll and pays their wages and the Social Security and withholding taxes incident to their employment; he also pays the Workmen's Compensation insurance premiums based on their remuneration and selects the insurer to whom such payment is made; he retains the right to discharge or replace either or both of the crew and pays, in addition to the items above-mentioned, all costs of operation, care and maintenance of the machine. It also appears to be the custom, or at least to have been understood by all the parties above-mentioned, that the machine owner has the right to go where the machine is working so as to keep up with the activity of the machine crew, ascertain whether the machine is being properly maintained and used and whether the work is of a proper type to be done by it and make any necessary repairs on the machine. These practices were all understood and, so far as appears, were observed or followed by all concerned in the instant case. It was testified without contradiction that A. O. Pridgen and Smith kept in touch with each other more or less regularly with respect to the progress of the work and related matters, that when the machine broke down on one occasion, Smith came to the Shipyard premises to assist in its repair, which was handled exclusively by or for account of Smith and that A. O. Pridgen, if requested to do work for which he thought the dragline was not suited, would

not do it without permission of Smith. It is also noteworthy, though rather obvious, that a dragline is a fairly complicated and valuable type of machine, requiring a crew with special skill, such as both Pridgens possessed.

As before indicated, neither Smith nor Sonnier had an express or implied contract either with each other or with Shipyard to do a particular piece of work nor did any specific act in the way of controlling the scope or details of the operations performed by the Pridgens for Shipyard. On the other hand the arrangement did not expressly provide that Shipyard was to have the right to do more than tell the dragline operator what particular jobs or pieces of work it wanted done, and, while this right obviously implied the further right to give the necessary specifications of each task, it did not, unless by pure implication, include the right to direct the operators in the details of how the machine was to be managed in order to accomplish the results. In actual practice, Zinnecker, who incidentally was not a foreman or work superintendent of Shipyard, but its President, and who gave all the directions that were given, restricted his activities to pointing out and describing to A. O. Pridgen the location and some general specifications of each item of the work, retiring thereafter from the scene until Pridgen would report it finished, and not meanwhile leaving any other representative of Shipyard present to supervise or observe. In describing his understanding of the arrangement, Zinnecker said that if it had appeared to him that the Pridgens were "not getting on with the job", he would simply have called Sonnier with the expectation that the latter would substitute either a new crew or another dragline and crew, but that finding them apparently very skilled men, he had no occasion to do this.

Before the Industrial Accident Board and since, Mrs. Pridgen has maintained that all three insurers (who will sometimes be referred to herein by using the names of the respective parties insured), were liable, while each insurer has insisted that its insured was not the employer of the deceased. The trial court, after all the evidence, instructed a verdict in favor of Mrs. Pridgen and Sonnier and against Shipyard and Smith, evidently on the theory that these two latter were respectively the special and general employer, and that in such a situation, absent contrary authority from our own courts, both insurers should be held under DeNoyer v. Cavanaugh, 221 N. Y. 273, 116 N. E. 992 and decisions to like effect from California, Kansas, Kentucky and Washington. On appeal by the unsuccessful insurers and Mrs. Pridgen, the Court of Civil Appeals, relying on Hilgenberg v. Elam, 145 Texas 437, 198 S. W. (2d) 94, re-

versed the case and rendered judgment holding Shipyard's insurer alone liable. 217 S. W. (2d) 176. The latter and Mrs. Pridgen applied for writ of error, the application of the insurer being granted to review the question of its liability and that of Mrs. Pridgen being accordingly granted also.

■ It is our conclusion that both courts below erred, and that the insurer of Smith, the general employer, and it alone, must bear the loss.

The facts as above related are without substantial dispute in the record, but the same cannot be said of the legal results deducible from them.

If Shipyard were in fact a special employer, or Sonnier some kind of co-employer of the deceased, DeNoyer v. Cavanaugh, supra, and the other decisions cited by Mrs. Pridgen with a view to holding all the insurers, might command more attention, but they are not, of course, persuasive that Shipyard was a special employer, nor that Sonnier was a special or general employer.

This last proposition is not very strongly urged, even by Mrs. Pridgen, nor do we see how it could be. The dragline work was done for Shipyard. The Pridgens were paid and otherwise treated by Smith as Smith's employees and were not known to Sonnier. That Shipyard may have thought they were Sonnier's employees does not make them so. By Sonnier's own arrangements with Shipyard and Smith, the Pridgens were to do work dircted by Shipyard, not by Sonnier. Smith did not tell them to report to Sonnier but to Shipyard. The arrangement could hardly be called a joint general employment by both Sonnier and Smith, when all the usual incidents of the employment were those which affected Smith only and were in effect agreed to by Sonnier, while, if we assume a status of special employer on the part of Shipyard, there is little to suggest that this was—if it could be—shared by Sonnier which had no interest in the plant or business of Shipyard or in the work in question except that the latter should continue to produce the $1.00 per hour commission or profit. There is definitely less evidence indicating Sonnier to be a general employer than there was with reference to the defendant Elam in Hilgenberg v. Elam, supra, and in any event the assumption in that opinion that Elam was the general employer was unnecessary to the decision, which held Elam not responsible for the negligence of the employee or servant in question.

■ There remains—in opposition to our announced conclusion—the contention that Shipyard was a special employer and therefore liable, either alone as urged by the other insurers, or jointly with Smith as argued by Mrs. Pridgen.

In Restatement of the Law, Agency, under Sec. 227, dealing with the subject of borrowed servants as a matter of common law, it is said at page 501 et seq:

"A continuation of the general employment is indicated by the facts that the general employer may at any time substitute another servant, that the time of employment is short, and that the lent servant has the skill of a specialist.

"A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality and these may be divergent from the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality. A person who is not in such business and who, gratuitously or not, as a matter not within his general business enterprise permits his servant and instrumentality to assist another, is more apt to intend to surrender control."

The foregoing is followed by examples of cases in which the employee in question is said to have not become the servant of the alleged special employer but to remain the servant of the general employer. If—to take one of these illustrations—a taxicab company which rents its cab and driver to a customer for a day upon the understanding that the driver is to take the customer anywhere the latter wishes to go and is to obey all his reasonable commands, and the driver does not thereby become the special servant of the customer in the absence of evidence that the customer is to control the details as to the management of the cab, then the same conclusion would follow a fortiori where the machine involved, as in the instant case, was considerably more complicated and obviously more valuable and requiring greater skill on the part of the operators than a mere taxicab. True, the passage under discussion does

emphasize the importance of whether the party renting the machine and operator is in the business of doing just that, but, as above stated, there is undisputed evidence in the instant case that contractors like Smith and Sonnier generally leased out their otherwise unoccupied draglines and operators and that both these contractors considered such a practice as part of their business, while the fact that this was not the exclusive or even primary activity of their business is counterbalanced by the greater value and more complicated character of the machine itself which naturally suggests an unwillingness on the part of the owner to surrender its control to the lessee. In the instant case, moreover, we have the undisputed testimony that all parties understood the lease to be on a "fully operated" basis which in our view negatives the right of the lessee to dictate the manner—or in the final analysis even the subject—of the operation of the machine. Certainly no one would suggest that Zinnecker had the right to require the Pridgens to run the machine motor faster or slower, to lower or raise the boom to a particular angle or otherwise direct the details of the operation, and evidently A. O. Pridgen would not without previous approval of Smith have used the machine for some purpose for which he considered it unsuited. As suggested in Hartford Accident & Indemnity Co. v. Addison (C. C. A. 5th Cir.), 93 Fed. (2d) 627, in which the party corresponding to Shipyard in the present case was held not to be a special employer, there is a vast difference between the right to point out the location and dimensions of a pit to be dug or indicate a pile of concrete slabs to be loaded into a truck, and, on the other hand, the right to direct the details of how such work is to be accomplished. There was a clear "absence of evidence" that Shipyard either was to control such details or made any attempt in fact to control them.

At this point, we must again consider Hilgenberg v. Elam, supra, strongly relied on to establish Shipyard as a special employer and to excuse Smith, the general employer, from liability. We do not regard that case as controlling—for all its factual similarity. It was a damage suit for the death of Hilgenberg against Elam, who (somewhat like Sonnier) had leased the bulldozer and its operator to Hilgenberg, after procuring both from Baldridge & Son (like Smith), owners of the machine and general employers of the operator. Baldridge & Son (unlike Smith) were not parties to the suit. The evidence was clear that Elam had no contract with Hilgenberg to do other than furnish the machine and operator and made no attempt to exercise any control over the work, while there was undisputed evidence as to the protracted period (6 weeks) during which Hilgenberg

and his partner had the machine doing their work and frequent presence of one or the other at the scene of the work, giving many directions for rather particularized small objects to be accomplished. That evidence, which was considerably more indicative of a special employment than the facts of the instant case, we held to establish such control on the part of Hilgenberg as to make him a special employer. However, after discussing the evidence from this viewpoint, the opinion significantly states: "At any rate, it cannot be said that Elam possessed the authority to direct the movements of the tractor in any direction, or that he had any control over the driver in the performance of the work either as to the result to be reached or as to the method of reaching the result." We think these words reflect the real ground of the decision, that is, absence of facts upon which a right of control in Elam, who was himself but a mere lessee of the machine "fully operated", could be predicated. We do not consider the case to require us in the present case to say that Smith, the owner of the dragline and employer of its crew, had no control over the details of management of the machine by the crew, or that such control was lodged in Shipyard as special employer. True, Smith may have had no contract at all with Shipyard, did not agree with Sonnier to do any specific job and did not do any particular acts of control over the Pridgens except to keep in touch with them. But in fact, by reason of his status and the understanding of all parties that the machine was leased "fully operated", Smith had and, without need of word or specific act, exercised control of the details of management of the machine. Certainly there was no agreement that he would not do so or that Shipyard or Sonnier would do so in preference to him. For Smith to retain con-control over his own machine and his own employee as to the details of operation, it was not essential that he be in charge of the general aspects of the work or have any contract at all with Shipyard.

Hartford Accident & Indemnity Co. v. Addison, supra, supports the conclusion we have reached. Shannon v. Western Indemnity Company, 257 S. W. 522 (Tex. Com. App.), confirms the significance we have given to certain aspects of the evidence as indicating lack of control by Shipyard over the management of the dragline. Maryland Casualty Co. v. Donnelly, 50 S. W. (2d) 388 (Tex. Civ. App., er. dism.), cited for the insurer of Smith, was a clear case of special employment on the facts, both the special employee and his general employer being engaged in manual work for the special employer wholly different in character from that of the general employment, peculiarly the business of the special employer and under the immediate direction

of the latter's superintendent as to the details of everything that was done. The important features that have influenced us in the present case were wholly lacking.

The judgment of the Court of Civil Appeals is reversed. The judgment of the trial court is modified so as to deny recovery to petitioner, Mrs. Minnie Pridgen, against petitioner, Insurors Indemnity & Insurance Company, insurer of Texas Shipbuilding Company, and as so modified is affirmed. All costs in this court and in the Court of Civil Appeals are taxed against respondent Traders and General Insurance Company, insurer of L. O. Smith, doing business as Texas Lumber & Construction Company.

Opinion delivered July 20, 1949.

Rehearing overruled. October 19, 1949.