### CENTRAL SURETY & INSURANCE CORPORATION v. HAMPTON et al.

No. 12924.

United States Court of Appeals
Fifth Circuit.

Jan. 19, 1950.

---

262

Ben R. Howell, El Paso, Texas, for appellant.

John J. Watts, Odessa, Texas, for appellees.

Before HUTCHESON, WALLER and RUSSELL, Circuit Judges.

WALLER, Circuit Judge.

Appellant issued to Elvin Hampton an automobile liability policy upon a Chevrolet dump truck wherein it agreed to indemnify the insured against all sums which he should become obligated to pay by reason of liability imposed upon him by law for damages, or death, sustained by any person because of an accident arising out of the ownership, maintenance, or use of the truck, and also to defend, in the name and behalf of the insured, any suits against insured alleging injury within the coverage of the policy.

The policy not being intended to cover workmen's compensation, there was inserted therein the following exceptions:

"This Policy Does Not Apply:

&ast; &ast; &ast; &ast; &ast; &ast;

"(d) under Coverages A and X, to bodily injury to or death of any employee of the Insured while engaged in the employment, other than domestic, of the Insured, or while engaged in the operation, maintenance or repair of the automobile;"

While the policy was in force Elvin Hampton, the insured, made an arrangement with one Harry Campbell whereby his brother, Billy Jack Hampton, would take the truck to Uvalde, Texas, and haul gravel used in the construction of an overpass over a highway by Campbell, hereinafter sometimes referred to as "the contractor". The agreement between insured and Campbell as to the compensation to be allowed for the truck and driver was not very definite as to the compensation to be paid. We set out in Footnote 1 the evidence as to the agreement between Elvin Hampton, the insured, and his brother, Billy Jack Hampton, the driver of the truck.[1] When Billy Jack and the truck arrived at the contractor's job they were put to work with the understanding that the

1. Elvin Hampton, the insured, gave the following testimony:
"Q. Who was driving the truck? A. Billy Jack Hampton.
"Q. Did you tell him to do the job? Did you hire him? A. Yes, I hired him—put him on the truck.
"Q. Did you discuss with Mr. Campbell how you were to be paid—what the work would consist of? A. I was to get 2¢ a yard for the gravel—2¢ a quarter for a yard of gravel I hauled for Harry Campbell.
"Q. Did you have an agreement as to the mileage—were you paid regardless of mileage, by the yard, or by mileage? A. 2¢ a quarter of a mile for a yard of gravel.
&ast; &ast; &ast; &ast; &ast; &ast; &ast;
"Q. Now, how did you receive pay for the truck? A. They took the boy's

truck would receive two cents for each quarter of a mile that each yard of gravel was hauled by the truck and out of the gross earnings of the truck the contractor would withhold and pay over to the driver seventy-five cents an hour for each hour worked. The cost of the gasoline, oil, and upkeep of the truck was to be borne by the truck owner. When the contractor paid the driver he made Social Security and withholding-tax deductions out of his wages as provided by law. He also carried the driver on his pay rolls and reported same to his Workmen's Compensation Insurance carrier weekly.

The hours in which the contractor's work went on were from seven to six but the driver of the truck could work as many hours within that time as he saw fit. Each driver was expected to check in at 7 a. m. in order that a record could be made of the hours worked, but he was not *required* to work any given number of hours. The truck owner was paid only for the yardage hauled and the driver was paid out of the truck owner's earnings only for the hours worked. The contractor had the same arrangements with other trucks and drivers. He had no right to hire or fire a driver, but in the event a driver were to be drunk or reckless or obnoxious, the contractor would pull the truck off of the job instead of discharging the driver. The driver could receive his load of gravel only at the crusher but the contractor had a right to designate the spot at which the driver should dump his load. An employee of the State Road Department, at the place where the gravel was dumped, kept the haulage records and made a slip showing the yardage hauled and the distance traveled by each truck, one copy of which was furnished to the truck owner and one copy to the contractor. On these slips the earnings of the truck were computed. There

was only one route from the rock crusher to the place where the rock was to be dumped and that was the one prescribed in the contract with the State Road Department, and was the route upon which the haulage distances were computed. Thus there was no occasion for the contractor to direct the drivers as to the routes to be taken in hauling the gravel. However, if a truck driver wished, he could drive through the town, five or six blocks out of the way, but no compensation would be paid for any distance except that laid out in the contract with the Road Department and used by all the trucks on the job.

Billy Jack Hampton had been working on the job for approximately two weeks when he was killed. It will be assumed that since Billy Jack Hampton was carried on the pay roll of the contractor and since his death was reported to the Industrial Accident Board of the State, death benefits under the statute were paid by the insurance carrier of the contractor to his heirs. However, a third party damage suit was filed in the State Court by Billy Jack Hampton's widow, for herself individually and as guardian of a posthumous child, against Elvin Hampton, the insured, for $150,000 damages wherein it was alleged:

"2. Plaintiff alleges that on or about the 3rd day of March, 1947, Billy Jack Hampton, now deceased, *was an employee of one Harry L. Campbell;* that at a point about 1½ miles north of Uvalde, Uvalde County, Texas, at a gravel pit, a truck belonging to the defendant herein was parked on an incline at the gravel pit; that the truck started rolling backwards and that the said Billy Jack Hampton ran to the truck to stop same and that when he reached a point behind the truck the gravel under his feet caused him to slip and to fall and the truck wheel ran over his

wages and gave me the remainder of 2¢ per quarter.

\* \* \* \* \* \* \*

"Q. When you sent the truck down, you could put anyone you wanted on the truck as a driver? A. I could have sent it—it didn't have to be Billy Jack Hampton.

"Q. In other words, you hired the driver for the truck? A. That's right. I hired him and sent him. And I told the boy the wages would be 90¢, and they cut him to 75¢—they said the job didn't pay but 75¢ an hour."

body as a result of which he sustained damages and injuries resulting in his death.

"3. Plaintiff alleges that the defendant herein was and is guilty of negligence because the defendant furnished to the said Billy Jack Hampton for *use and operation* a highly defective truck and plaintiff alleges in this connection that the defendant knew that the brakes on the truck were defective at the time that he furnished same to the said Billy Jack Hampton and plaintiff alleges that the act of furnishing the said Billy Jack Hampton a defective truck with defective brakes to be used by him in public work and carrying heavy loads constitutes negligence, which said negligence was and is a proximate cause of the plaintiffs' damages and injuries, for which they here sue." (Emphasis added.)

Thereafter the Insurance Company sought in the District Court of the United States for the Western District of Texas a declaratory judgment as to whether or not it was required, under this policy, to defend this suit against Elvin Hampton and to assume liability to pay any judgment that might be rendered against that defendant therein. It asserted that the question of the plaintiff's obligations and liabilities under the automobile insurance policy could not be determined in the State Court since the coverage of the policy was not a material question to be disposed of in that suit.

■ Counsel for appellees in his brief undertakes to demonstrate that the Court below had no jurisdiction, or should have declined to accept jurisdiction, to entertain the suit under the decisions of McLain v. Lance, 5 Cir., 146 F.2d 341 and Maryland Casualty Co. v. Boyle Const. Co., 4 Cir., 123 F.2d 558, and cases therein cited, to the effect that the Federal Court should defer to the State Court where in the latter a case between the parties is already pending involving substantially the same issues. We have no fault to find with the asserted rule, but in the present case the issues involved are not the same as the issues involved in the State Court. We think that the decision in Hardware Mutual Casualty Co. v. Schantz, 5 Cir., 178 F.2d 779, disposes of this question contrary to appellees' contentions.

In the suit for a declaratory judgment the lower Court submitted to the jury only the following special issue:

" 'Do you find from a preponderance of the evidence that Billy Jack Hampton was or was not an employee of Elvin Hampton on the date of the accident in question which resulted in his death?'

"Your answer will be 'He was an employee of Elvin Hampton on said date' or 'He was not an employee of Elvin Hampton on said date.' "

On this issue the jury rendered the following verdict: "He was not an employee of Elvin Hampton on said date."

■ There is no evidence in the record as to how Billy Jack Hampton came to his death or as to what he was doing, or what the truck was doing, if anything, or whether at the time of his death he or the truck was engaged in work for the contractor, Harry Campbell. The test of whether or not a general employee is also a special employee is to be determined by the situation existing "at the time of the injury" and not merely "on the date of the accident" as formulated in the special issues submitted. For aught that the record shows the truck may have been parked for the day or night, or it may have been waiting in line to receive a load of rock from the crusher, or it might have been broken down and not in operation. However, we are not called upon to determine whether Billy Jack was a special employee of Campbell, but whether, in any event, he was some kind of an employee of his brother.

■ The plaintiff alleged in her State Court declaration that Billy Jack "was an employee of one Harry L. Campbell" and it is undisputed in the testimony quoted in Footnote 1 that Elvin Hampton "hired" his brother, Billy Jack. His testimony to that effect is all of the testimony on the subject. It is not in dispute that the insured intrusted his truck into the care and custody of his brother for the latter to operate, maintain, and look after, and to that end

Billy Jack could have worked as many or as few hours a day as he chose, within the hours that the work went on. There is no dispute that Billy Jack was paid out of the earnings of Elvin's truck which Elvin had agreed—impliedly, at least—would be used for that purpose. The duty to operate, maintain, repair, and furnish gas and oil for the truck was an obligation of Elvin. The right to hire and fire the truck driver was in the owner. The right to direct the truck driver as to the number of hours that he worked was not in the contractor. The number of hours that the truck was operated, the number of yards of gravel that it hauled, were prime concerns of the owner, and the right to insist upon the maximum performance of the truck was likewise his prerogative.

This is not a workmen's compensation case wherein it is necessary for us to determine whether or not Billy Jack was a special employee of the contractor at the time of his injury. It is, instead, a case to construe the exceptions in a policy of indemnity insurance which provides that the policy shall not cover injuries or death to an employee while engaged in the employment of the insured or while engaged in the operation, maintenance, or repair of the truck. The admitted facts show conclusively under the holdings of the Supreme Court of Texas in Insurors Indemnity & Insurance Co. v. Pridgen, 223 S.W.2d 217, 220, that Billy Jack was, and continued to be, until the time of his death, the general employee of his brother.

In that case the Court quoted, and approved, the following from the Restatement of the Law, Agency, Sec. 227, p. 501: "A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality and these may be divergent from the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the serv-

ant would expect his general employer would desire, the original service continues."

It is our conclusion that Billy Jack Hampton was the general employee of Elvin Hampton and even though he might also have been the special employee of the contractor in and about the actual use of the truck on the job, nevertheless those two relationships are not inconsistent, and since Billy Jack continued to be the general employee of Elvin he was engaged in that employment within the exceptions in the policy both in the operation and maintenance of the truck. If Billy Jack came to his death when the truck rolled over him when he ran to stop the truck after it had begun to roll, as alleged in plaintiff's State Court declaration, such an act of the deceased should be deemed either in operation of the truck or in the maintenance thereof—either of which was within the scope of his duty as a general employee of the owner of the truck.

From the case made out by the plaintiff's pleading in the State Court and the evidence in the Court below, it is clear that the plaintiff's damage suit was within the exception, rather than within the coverage, of the policy, and the Court below should have so declared.

The judgment is

Reversed.