**Ben D. RECTOR, Appellant,**

**v.**

**WALDEN, FULTON & PAYNE, a Partnership, Appellee.**

**No. 6418.**

Court of Civil Appeals of Texas.

Amarillo.

June 21, 1954.

Rehearing Denied Sept. 7, 1954.

934

Underwood, Wilson, Sutton, Heare & Boyce, Merchant & Fitzjarrald, Amarillo, for appellant.

Adkins, Folley, Adkins, McConnell & Hankins, Amarillo, for appellees.

PITTS, Chief Justice.

This is a suit filed by appellant, Ben D. Rector, for alleged personal damages in the sum of $37,000 sustained by reason of an injury he received while helping to unload some heavy pipe from a gondola type railroad car. It is charged that the alleged injury resulted from the negligent operation of a winch truck by one Irving Warner. The primary issue to be here determined is whether or not Warner, the truck operator, remained the general employee of appellee,

a partnership composed of Walden, Fulton and Payne, at the time of appellant's injury, or whether or not Warner was a special or loaned employee of the R. M. Wells Company for which company appellant was an employee at the time of his injury.

The case was tried to a jury. At the close of the evidence, appellee presented a motion for a peremptory instruction on the alleged grounds that Warner, the truck operator, was working under the direction and supervision of R. M. Wells and Company as a special or temporary servant or employee of Wells at the time of appellant's injury and that appellee was not therefore liable for appellant's injury. The trial court granted the motion, discharged the jury and entered judgment for appellee, from which an appeal has been perfected.

The material facts are not controverted. Appellee, the partnership, was the general contractor in constructing the Pantex Plant in Carson County near Amarillo. R. M. Wells and Company was a subcontractor under a separate contract for the purpose of doing the plumbing, heating, air conditioning and pipe fitting for the Plant, and appellee had no control over Wells and Company. Appellee owned considerable equipment consisting of winch trucks and other machinery purchased for its own use and ordinarily used in construction work. It was not unusual for appellee to rent out or lease out equipment to other contractors for their use. Appellee had previously leased winch trucks to Wells and Company which company had again on this occasion by an informal agreement leased a winch truck and a capable operator therefor from appellee to be paid for on an hourly rental basis agreed upon and the same was paid for by Wells. Appellee's equipment foreman, Charles Playter, instructed its employee, Irving Warner, to take a winch truck and report to R. M. Wells Company for work. Warner did so and was directed by a Wells Company employee to assist several Wells Company employees including appellant in unloading pipe from a gondola freight car and placing the same on a rack some 75 yards from the said freight car. The pipe belonged

to Wells and Company and the unloading of it was under the exclusive control of Wells and Company. However, it was being moved by Wells and Company employees and the winch truck with Warner as the truck operator. In moving the pipe Warner would back the truck up to the railway car and lower the "boom" or winch line to the crew of Wells employees inside the car where the said employees would then attach a load of pipe to the said line and then give Warner a signal to lift the pipe, which he did and then drove the load to the rack to be there unloaded. To assist Warner at the unloading rack were appellant and "Shorty" Quaid, both employees of Wells and Company. At the unloading rack Quaid spotted the truck for Warner by giving him hand signals to move the truck forward or backward at a particular angle and where to stop the truck exactly at a proper place for unloading and Quaid also gave further signals to Warner when to raise or lower for winch line in order to unload the pipe with the help of himself and appellant. Warner followed the signals and instructions given him by the employees of Wells and Company. Such was the procedure on the occasion of date July 9, 1951, when Warner, while following the directions of Quaid, backed the truck into a stack of pipe causing a piece of pipe or one of the joints to "lever up", hit appellant, Ben Rector, in the face which caused the alleged injuries. The testimony of Coy W. Hix, office manager of Wells and Company at the time of appellant's injury, fully supports the foregoing facts. Hix testified that he was observing the work prior to and at the time of appellant's injury; that there were either two or three Wells employees in the gondola car giving Warner signals about how to back the truck up to the freight car for loading and appellant and "Shorty" Quaid were at the unloading rack giving Warner hand signals about how to back the truck up to the rack for unloading it; that Warner followed the signals given him by the Wells employees; and that Quaid was giving Warner the hand signals for moving the truck at the time appellant was injured. The Hix test-

imony was fully corroborated by the testimony given by appellant, "Shorty" Quaid, Irving Warner, the truck operator, and by J. D. Howell, job foreman for R. M. Wells and Company, at the time and place of appellant's injury. Howell testified that he gave the Wells employees instructions for the work in question to be done, including the giving of hand signals to the truck operator, which signals were necessary in order for the truck operator to properly operate the truck. Howell further testified that a winch truck was not the proper equipment to be used in unloading the pipe and that he so told Clem Rider, superintendent of R. M. Wells and Company, who said he could not get a motor crane to do the work with and that a crane cost too much anyway, for which reason Rider directed him to use the winch truck.

Both parties contend that under the record presented the controlling issues should be determined as a matter of law. They are not in agreement, however, as to a proper application of the law, and in the alternative appellant says fact issues have been raised. It may be observed that in most such cases where the material facts are not controverted, the results of the controlling issues have been determined as a matter of law. In the case at bar in support of his contentions, appellant cites, quotes from at length and relies upon the case of Insurors Indemnity & Insurance Co. v. Pridgen, 148 Tex. 219, 223 S.W.2d 217, while appellee cites, quotes from at length and relies upon the case of Hilgenberg v. Elam, 145 Tex. 437, 198 S.W.2d 94, and they both seem to agree that there is no conflict in the law announced in the two cases. For these reasons the material facts in the two said cases will be restated briefly and discussed by us more fully than usual.

In the Pridgen case the Shipyard (E. B. Zinnecker, president) needed a dragline, a special kind of machinery, to enlarge a slush pit, widen a slip, remove some heavy concrete slabs and do other maintenance work on its premises. Zinnecker called

Sonnier Construction Company, which company had previously rented him such machines with operators, and leased from Sonnier a fully operated dragline at a rental of $8 per hour to do the said work. There was only a general discussion then about the character or details of the work to be done. Sonnier merely agreed to have a fully operated dragline report to Zinnecker at the Shipyard premises presumably to do such jobs as Zinnecker directed. Sonnier then had no spare dragline available but arranged with L. O. Smith, doing business as Texas Lumber and Construction Company, engaged in the same line of business as Sonnier, to furnish Zinnecker a fully operated dragline at a lease rate of $7 per hour as between them and instructed Smith to report to Zinnecker at the Shipyard for duty. Smith had his employee, A. O. Pridgen, operator, report to Zinnecker for duty with the dragline and sent with the operator another Smith employee, Walter Lee Pridgen, a brother of the operator, to assist in the operation and labor. There was no express or implied contract between any of the parties to have the dragline to do any particular kind of work. Neither did the arrangement expressly provide for the Shipyard to do more than tell the dragline operator what particular jobs or kind of work it wanted done, together with any necessary specifications of each task. The arrangements did not include the right of the Shipyard to direct the operations in order to accomplish the results. E. B. Zinnecker, President of Shipyard, gave A. O. Pridgen all of the directions that were given by pointing out the work to be done, describing it and giving some general specifications about it and then left it under the control of A. O. Pridgen to complete and report to him when it was finished. Under such arrangements the Pridgen brothers labored three days for Shipyard and Zinnecker and while loading some heavy concrete slabs into a truck with the use of the dragline, the lifting cable of the dragline came in contact with a nearby electric power line while Walter Lee Pridgen was holding the lifting cable and the live wire shock killed Walter Lee Pridgen. As a result of the casualty, Mrs. Minnie Pridgen, mother of Walter Lee Pridgen, filed a compensation suit against all of the insurers for Shipyard, Sonnier and Smith, seeking a joint and several judgment against them all.

At the close of the evidence the trial court withdrew the case from the jury and rendered judgment in favor of Mrs. Pridgen against the insurers only of the Shipyard and Smith, exonerating Sonnier from liability. The Court of Civil Appeals, 217 S.W.2d 176, reversed the trial court and held that the Shipyard's insurer alone was liable. A writ of error was granted and the Supreme Court held that both lower courts were in error and further held that the insurer of Smith alone, the general employer, was liable. In so holding it found that the dragline was a fairly complicated and valuable type of machine which required men with special skill, such as the two Pridgens possessed, to operate and care for it; that it was an agreeable custom, there at least, for the machine owner to send experienced, skilled operators along with the machine to maintain and care for the same and to see if the work was of a proper type for the machine to do; that while the work was being there done, by the Pridgens, the operator A. O. Pridgen and his general employer, Smith, kept in touch with each other more or less regularly with respect to the progress of the work and matters related thereto; that during the work the dragline broke down and Smith, the general employer, went to the Shipyard premises and helped repair the same at his own expense. No Shipyard representative supervised or observed the work while it was being done. The Supreme Court there observed that [148 Tex. 219, 223 S.W.2d 221]:

"* * * there is a vast difference between the right to the point out the location and dimensions of a pit to be dug or indicate a pile of concrete slabs to be loaded into a truck, and, on the other hand, the right to direct the details of how such work is to be accomplished. There was a clear 'ab-

sence of evidence' that Shipyard either was to control such details or made any attempt in fact to control them."

The Court there carefully distinguishes the facts in the Pridgen case from the facts relied upon by the Court of Civil Appeals in other cases and particularly did it distinguish that case from the Elam case and pointed out that the evidence was clear that Elam had no contract with Hilgenberg to do anything other than furnish the machine and operator and made no attempt to exercise any control over the work. The Court further points out that in the Elam case Hilgenberg and his partner were frequently present and giving directions about how their work should be done and further shows that Elam had no control over the work being done but was merely a lessee while in the Pridgen case Smith, the general employer, kept in touch with the work while it was being done wholly by his employee who exercised control of the details in the management of the machine.

In the Elam case, Elam was a contractor engaged in building slush pits in the oil fields, using a caterpillar tractor with a bulldozer attached thereto which he had leased, together with a driver, from Baldridge & Son, who were not parties to the suit. Baldridge & Son paid the operator and they also paid all of the expense for operating the machine and for repairs and furnished the machine and driver to Elam for $6.25 per hour. Elam would occasionally sublease the machine and drivers to farmers and ranchers for their use. He subleased it, together with Bennett as the driver, to L. W. Hilgenberg and Alton J. Willingham, a partnership, for $8.50 per hour to be used by the partnership in knocking down and uprooting trees and in digging a surface tank on a farm. When Bennett was doing the said work, the machine ran over L. W. Hilgenberg and killed him, which resulted in the filing of a suit for damages by the surviving wife and the mother of the deceased. The question for determination was whether or not Elam was liable.

Under the facts there presented Elam [145 Tex. 437, 198 S.W.2d 95] "was not present during the operations, he issued no orders concerning the same, nor was it contemplated that he should. He had nothing to say about the character of the work nor the manner in which it was to be performed. He was not hired to perform any work nor to obtain any certain results. In fact, he knew nothing about removing trees or building tanks. He merely agreed to furnish the machine and driver for such work as Willingham and Hilgenberg desired done. Only the driver had physical control of the machine and understood its mechanical operation, but Willingham and Hilgenberg had sole authority to show him where to work and what to do. They pointed out the directions and places for the machine to go, the timber and brush to be removed, and the excavations to be made." On the day of his death Hilgenberg was pointing out the work to Bennett, the machine operator, and directing the work to be done and Bennett was operating the machine under such instructions in doing the work when the fatal accident occurred. The court there presents the question of whether or not Bennett was at the time and in that particular operation, acting for and under the direction of Hilgenberg, the borrower or temporary employer, or did he remain the servant of Elam, the general employer. The court therein observed that before Elam could be held liable "under the principle of respondeat superior the relation of master and servant must be shown between him and Bennett with respect to the very transaction out of which the injury arose." Under the factual situation there presented and the authorities there cited, it was held that Elam was not liable, although it was there contended that because of the technical and mechanical intricacies involved in the operation and maintenance of the machinery, Bennett owed certain duties to Elam.

The general factual situation in the case at bar is in some respects similar to the general factual situations in both the Pridgen and the Elam cases. Yet, there are

some distinguishable features between all three of them but the law applicable to any such case depends upon the particular and special existing factual situation concerning the very transaction out of which the injury arose. In the Pridgen case the work of the machine operator was not supervised in the least in connection with the work being done and the transactions out of which the injury arose. In that case the specific job was merely pointed out to the operator by the temporary employer or borrower and the operator did the work in his own way but kept in touch at the same time with his general employer about the work. In the Elam case, Elam, the general employer, merely furnished the machine and the driver, both of which he had leased from a third party, and had nothing to do with the work, which was being supervised and carefully directed by Hilgenberg, the borrower, during the very transactions out of which the injury arose. For this reason principally, the trial court instructed a verdict for Elam, which was sustained by both higher courts. The Pridgen and Elam cases are materially distinguishable as to the supervision and direction of the work being done in each case at the very time of the injury and the transactions in connection therewith. In the Pridgen case the machine operator was his own boss but was in close touch with his general employer, while in the Elam case, the borrower who was killed was supervising the work and closely directing it at such time.

According to the record here presented appellee had no contract with Wells and Company to do anything other than furnish a truck and an operator therefor. Appellee made no attempt to exercise any control over the work or the result thereof and had nothing to do with moving the pipe other than to furnish Wells a winch truck and an operator to be used as Wells saw fit. The same was being used and operated for the benefit of Wells and Company and under the direction of the Wells employees on the occasion in question and in connection with the very transactions out of which the injury in question arose. Warner, the truck operator, operated the machine under the supervision and direction of the employees of Wells and Company, who had sole authority to show him where to work, pointed out the work to him and gave him directions when, where and how to use the truck in unloading the pipe from the gondola freight car.

In our opinion the facts conclusively show that appellant received his injuries as a result of the moving truck while it was being operated at the time and place in question under the supervision and direction of the agents and employees of R. M. Wells and Company, who had authority from their employer to so act and were exercising such authority, and that the material facts here presented therefore bring the case within the rules of law announced in the case of Hilgenberg v. Elam, supra, supported by other authorities therein cited. We likewise believe that the factual situation here presented concerning the controlling issues to be determined is wholly different and distinguishable from the controlling factual situation presented in the case of Insurors Indemnity & Insurance Co. v. Pridgen, supra, and that the rules of law therein announced do not control or apply to the controlling facts here presented. In support of our holding we cite also the case of Steele v. Wells, Tex.Civ. App., 134 S.W.2d 377 (writ refused), in which an instructed verdict was sustained, and the case of Magnolia Petroleum Co. v. Francis, Tex.Civ.App., 169 S.W.2d 286 (writ refused), wherein the trial court was reversed because it failed to instruct a verdict for the defendant.

For the reasons stated the evidence conclusively supports the trial court's judgment under the law. Appellant's points of error are therefore overruled and the judgment of the trial court is affirmed.