**PANGBORN CORPORATION, Appellant,**

v.

**Stanley W. JACOBS, Appellee.**

No. 16426.

Court of Civil Appeals of Texas.

Fort Worth.

May 24, 1963.

Rehearing Denied June 21, 1963.

Brown & Murray and M. Hendricks Brown, Fort Worth, for appellant.

Rumph, Ivy & Karpenko and Evans J. Karpenko, Fort Worth, for appellee.

MASSEY, Chief Justice.

The appeal is from a judgment for plaintiff Stanley W. Jacobs for damages on account of personal injuries growing out of an industrial accident. Judgment was against the defendant Pangborn Corporation, which had furnished steel to be erected into a structure by plaintiff's own employer. Incident to said construction Pangborn had furnished the services of one Carbaugh to assist the purchaser of the steel, and also assist plaintiff's employer, as the erecting contractor. It was on account of negligence averred on the part of Carbaugh, and by and through him on the part of Pangborn under the doctrine of *respondeat superior*, that plaintiff brought his suit. Carbaugh was not named as a party defendant.

Judgment reversed and the cause remanded for another trial.

A statement is necessary. Pursuant to the contract between Pangborn and Texas Steel Company, Pangborn contracted in writing with reference to a certain "erection", as follows: "(Pangborn to furnish) One Lot Services of an experienced Erecting Superintendent to supervise Purchaser's Labor in the assembly and erection of the equipment at a per diem rate of $65.00 for (8) hours which includes Erector's living expenses; plus transportation not to exceed rate from Hagerstown, Maryland and return, also transportation to and from job. Purchaser furnishes labor and all other items required to properly erect the equipment." The "experienced Erecting Superintendent" mentioned in the contract was Carbaugh, one of several such employees of Pangborn.

The provision quoted was actually supplemental to a contract whereby Pangborn sold to Texas Steel prefabricated structural steel for assembly incident to the erection of a structure. The steel pieces sold were sized and perforated under a standard design of Pangborn, sort of a "package deal". Pangborn does not contract to erect these structures, responsibility therefor lying upon the customers to whom such sales are made.

On the trial Pangborn produced as a witness one Johns, that company's superintendent over Carbaugh. He testified that in many instances Pangborn's customers buy the prefabricated steel pieces for erection into the same kind of structure as that with which we are concerned and erect the same without the services of any of Pangborn's "erecting engineers", such as Carbaugh. However, Pangborn usually recommends a contract of the nature quoted, and which provides for an "experienced Erecting Superintendent", since they believe that the erection is thereby facilitated to the greater satisfaction of all parties. In connection with the time and services of such an engineer or superintendent

Pangborn pays him for his services and reimburses him his expenses and in turn bills the customer in the amount called for by the contract. This was true as applied to the activities of Carbaugh, under the aforesaid contract. Mr. Johns testified that for Carbaugh to have taken part in the actual erection of the structure was not his normal work and that no authority had been given Carbaugh to do this nor to be "receiving steel" on the structure being erected. Johns further testified that Carbaugh did not have authority from Pangborn to exercise supervision over the labor but that it was expected that he would work with whomever Pangborn's customer would place in charge of the erection.

A Mr. Johnson was the superintendent for General Engineering Corporation, plaintiff's employer, which had contracted to "put together", according to plans and specifications recommended by Pangborn, the steel Pangborn had sold and delivered to Texas Steel. Under Johnson was Mr. Ashcraft, the superintendent or job foreman at the Texas Steel premises. As applied to the phase of the construction activities with which we are concerned it may be properly said that General Engineering's contract solely related to the furnishing and superintending of the labor in the erection of the structure. In the beginning, or as the job was started, Johnson and Ashcraft met with Carbaugh. It was revealed and became apparent that General Engineering and its men were inexperienced in erecting steel structures embodying a gauge of metal of the size and weight Pangborn had sold Texas Steel Company. Ordinarily their experience was with what is termed "sheetmetal". Johnson testified that Carbaugh agreed with them that he would "take the lead in order to get the job in faster", and agreed "to help get everything started and go along and that he would, you know, more or less take the lead of the direction of where everything went to."

Carbaugh's own testimony was that his job was to see that the structure was

erected properly, to instruct what should be done in connection with the erection and the order in which the steel pieces were placed in the structure, that he would give the order of construction sequence to a foreman in charge of General Engineering's labor personnel, but that he would have to do some of the work himself in order to "show" members of General Engineering's labor force how to perform certain tasks. The record is absent of any identity of what General Engineering employee or employees were being "shown" how to perform the task undertaken by Carbaugh at any particular time.

In connection with the actual activity in which he was engaged at the time plaintiff sustained his injury, Carbaugh stated that he was himself actually performing the task in order to show General Engineering men how it was done. We are not told who the men were. The activity in question involved giving signals to a crane operator on the ground relative to swinging horizontally into position and lowering into its proper vertical position a rectangular piece of iron (weighing around 380 pounds and called a "partition plate"), coupled with the preparation to apply hand guidance of the iron piece by what is called "drifting" it into position. There was another workman (an employee of General Engineering) at the opposite end of the partition plate preparing to act in cooperation with Carbaugh by using his hands at the same time in helping to "drift" it into its proper final position. It is observable from this description what the witness Johns referred to as "receiving steel".

Other evidence in the record was to the effect that Carbaugh had already performed the same rather hazardous and complicated task at several other points on the structure where similar "partition plates" had been installed at times when General Engineering men were observing the procedure. The effect of such evidence would warrant at least three different conclusions relative to time of plaintiff's injury: (1) that Carbaugh was actually di-

rectly performing the task for Pangborn in "showing" the employees of General Engineering how it should be done, (2) was voluntarily performing the task as a courtesy and favor for General Engineering because said corporation did not have anyone in its employ capable of performing it, or (3) was performing the task in furtherance of the interest of Pangborn because otherwise there would in his opinion be a resulting undue delay in the accomplishment of a completed structure, for which delay his said employer might be in some way held responsible.

In order to describe the manner of plaintiff's injury it is necessary to describe the state and condition of erection at the particular part of the structure where the work was being performed, and the nature of said particular part as of the time of the injury.

The prefabricated steel when put together was to provide a framework or "case" for a series of "dust bins" into which the dust from Texas Steel Company's plant would be drawn and captured. As finally constructed and installed there were to be about a dozen of these bins supported by and encased within a steel framework running on top of the lower part, and alongside and near the top of the upper portion, of the plant building. It was during the time that the steel framework was being assembled that plaintiff's injury occurred.

The structural steel framework ran lengthwise of the building, but may be considered by "sections", put together "end to end" ultimately to result in the completed frame structure. There were about a dozen sections, or as many as there would eventually be of the dust collector bins. The upper end portion of each section (as it joined the adjacent section) was intended to support what will be termed as a "partition plate". Each partition plate weighed around 380 pounds, and was of rectangular shape, about 9 feet across by 3 feet in height. On the ends of the sev-

eral sections these partition plates would rest, when installed, anchored by bolts or rivets. In the center of each section was open space (where a dust bin would eventually be set in place), with a steel framework surrounding such including what was called "knee braces", i. e., iron strips running in various directions connecting to larger pieces called "channel irons". One channel iron extended across the top of the framework, where it would ultimately be bolted or riveted to the lower ends of partition plates. There was, of course, such a channel iron along the top of each side of each framework section. The lower end of each partition plate contained holes intended to be used in the bolting or riveting of the same to a channel iron. Each channel iron weighed around 300 pounds.

From the demonstration by counsel for both parties, pursuant to the presentation of oral argument on appeal, it is readily observed that probably the most hazardous operation involved in the erection of the entire structure was the "setting" of the "division plates". In each operation the end of one channel iron, except for the fact that such end was resting upon a little iron plate bolted on an upright piece of steel, was shown to have been entirely free and unconnected with any other part of the structure. In this state it remained until a partition plate was "lowered and drifted" into position where it and the free end of the channel iron could be fastened together by a supplemental operation to accomplish that purpose. That operation would be to bolt the "free" end of the channel iron to the lower part of the end of the partition plate, as it was held in a vertical position by a crane.

At time of plaintiff's injury there was a large crane on the ground alongside the structure being erected. The operator thereof was using the crane to pick up and swing into position each of the heavy pieces of steel in the order in which they were installed. As previously mentioned, several of the partition plates had already been positioned and fastened. This had been ac-

complished through an operation whereby the crane operator would use his machinery to lift each partition plate and swing it across the structure to the approximate point where it would be finally placed in position, then, in compliance with hand-signals from one of the two men performing the ultimate task of "drifting" the partition plate into position (in part through use of their hands) would move it horizontally if that was indicated, and in any event lower it, along and in cooperation with action by the men on the structure "drifting" the plate into position for fastening.

The structure was between the top of the Texas Steel Company building and the crane on the ground. Hence one of the men on the structure had his back to the crane operator, but the one furthest away—nearest the top of the building—was in position to look down at the crane operator and signal to him. This man was Carbaugh. It was at Carbaugh's end of the vertical framework at one end of a section, upon which the partition plate important to the case was to be put in position that the channel iron, heretofore mentioned, had its "free end", i. e., which was not connected to anything, but merely resting upon a plate installed for that purpose at or adjacent to the point where Carbaugh was "receiving" the partition plate. Below Carbaugh, although a little to one side, plaintiff and another man were working on the installation of knee braces.

There was evidence that Carbaugh was giving signals to the crane operator, who was in turn swinging the partition plate into position. There was evidence to the contrary, though of little force. It seems that in obedience to signal the crane operator was beginning to slowly lower the same in the anticipation that Carbaugh and the assisting General Engineering employee would use their hands to "drift" it into position. At this point there is testimony which indicates that some unusual noise caused Carbaugh to look behind him. Simultaneously the end of the channel iron, which was the free end right by Carbaugh's

position on the structure, came off the plate on which it rested. The channel iron, being fastened at its opposite end by two bolts, did not come completely free immediately, but swung in an arc. This motion resulted in the shearing of the bolts at the opposite end, whereupon the entire channel iron fell free (of any connection with any other part of the structure). As the channel iron or the free end thereof was falling it passed close by one of the knee braces with terrific force. This was the knee brace on which plaintiff was working. He had his right arm across it, either in affording support to himself or in working it into position. The passing of the channel iron in close proximity to the knee brace "scissored off" plaintiff's arm. The channel iron continued to fall, passing completely through the roof below it.

There is evidence that the crane operator saw the channel iron fall, and that he immediately "dogged off" on his machine, which in parlance of the industry means that the crane was immediately stopped so that the partition plate was lowered no further, nor moved in any direction. There is also testimony that the partition plate did not strike any part of the structure, but was held motionless above the same. Contrarily there is testimony that the partition plate did strike against the inner side of the channel iron and knocked it outward so that its end came off the plate on which it was resting. Although it is by inference, there is also evidence that the partition plate struck against some other part of the structure and jolted the same with such force that the channel iron was caused to slip off the plate.

Raised as a question of fact, but not concluded as a matter of law, was whether Carbaugh was acting as the agent, servant and employee of Pangborn in his performance and intended performance of a task immediately prior to and at the time of plaintiff's injury. Despite the objection of Pangborn to the absence of an inquiry of the jury by an issue, or issues, which would resolve what we hold was a question of fact,

the trial court failed and refused to submit the same. Pangborn filed and presented specially requested issues directed to presentation of the question, and these were refused. The case was submitted to the jury by a charge which made no inquiry upon the matter of agency, scope and course of employment, etc.

In this connection it is noted from the pleadings of the plaintiff that he alleged that at all times incident to the suit Carbaugh was acting as an agent, servant and employee of Pangborn, and working and acting in the course and scope of his employment.

Pangborn, by its pleadings, denied the allegations and contended further that "at best" Carbaugh should not be considered more than a fellow employee and workman with plaintiff, and/or with the operator of the crane, an employee of General Engineering's subcontractor. It is of interest to note that the crane operator had been acquitted of negligence in a former trial, as result of which that subcontractor, who was at the time a co-defendant of Pangborn, was discharged as having been acquitted of any liability to plaintiff. At another point in Pangborn's pleadings it was alleged that Carbaugh was either a fellow employee of the plaintiff or was an agent or servant of plaintiff's employer at the time in question. At another point Pangborn specifically denied that Carbaugh was at the material time acting as an agent or employee of Pangborn Corporation, or that Carbaugh's acts were in the scope of his authority or of his employment; and further, that "at best" Carbaugh's acts were those of a volunteer performing gratuitous work for plaintiff's employer at the material time.

Had it been Carbaugh who was injured, and had it been the employer of the plaintiff against whom Carbaugh was attempting to obtain a personal injury judgment, the questions of law involved would have been somewhat similar to those the writer had under consideration in the case of Stephens v. Mendenhall, 1956 (Tex.Civ.App., Fort

Worth), 287 S.W.2d 259, writ ref. n. r. e. In that case a major task of the injured plaintiff, on the trial, was to prove that he was acting at the time of injury as the agent, servant and employee of Hayden Farmer Drilling Company and to obtain a jury finding to that effect, for unless he could do so there was little question but that he would properly be treated as "volunteer" servant of the defendant, and as such foreclosed from imposing third party tort liability upon the defendant. He was successful, and our holding in that case was that the evidence supported the jury's finding that plaintiff was, in the commission of the act which resulted in the injury, acting for the benefit of his own principal employer, rather than solely seeking to promote the interest of the defendant and of the defendant's employee whom he was attempting to aid.

■ We believe it as essential to a recovery in the case before us that the plaintiff obtain jury findings that Carbaugh was Pangborn's agent, in performing the function of signalling and/or manually guiding the partition plate into position, as the same matter was essential to the plaintiff's recovery in Stephens v. Mendenhall. In neither instance could it be said that there was an "ascertained state of facts" which would entitle the trial court to resolve the question as a matter of law.

■ In the instant case it appears from the evidence that there was a fact question as to whether Carbaugh, in performing an act alleged to have been incident to the event as result of which plaintiff sustained his injury, was a mere "volunteer" (i. e., was performing in behalf of plaintiff's employer, etc.) or was undertaking to perform an act of service for or in furtherance of the interest of Pangborn, his own principal employer. Carbaugh's own testimony was that he was acting for Pangborn, but that testimony amounted only to a declaration by an agent tendered to prove the existence of agency and authority thereunder. It is true that his testimony was admissible

against Pangborn in view of the antecedent evidence of Pangborn's contract with Texas Steel Company. Nevertheless, mere questions of fact were raised thereby. Not "ascertained" were facts or uncontrovertible factual conclusions which entitled the trial court to decide as a matter of law that Carbaugh was Pangborn's agent, acting for or in furtherance of Pangborn's interest in his performance of the task undertaken immediately prior to and at the time of plaintiff's injury.

■ While we have little doubt but that the jury would have found that Carbaugh was in fact acting solely for Pangborn, and within the scope and course of that employment, the fact remains that it did not do so. We believe that the nature of the case, coupled with the rather involved interlocking cooperative activities incident to the erection of the structure on the part of several principals, through agents and servants, made it essential that the issue of Carbaugh's agency, etc. be resolved by a jury determination. See Restatement of the Law, Agency, p. 483, et seq. "Third Person vs. Principal", sec. 220 "(Who is a Servant) Definition". See also under the Restatement, p. 498, sec. 226, "Servant Acting for Two Masters"; p. 500, sec. 227, "Servant Lent to Another Master"; p. 505, sec. 228 (Scope of Employment) General Statement; p. 507, sec. 229, "Kind of Conduct Within Scope of Employment"; p. 559, Title C., "Torts of Agents Who are not Servants", sec. 250, "Non-Liability for Physical Harm"; 57 C.J.S. Master And Servant § 617, p. 408 et seq.—Questions of Law and Fact, and § 618, p. 418 et seq.— Instructions. See also Standard Oil Co. v. Anderson, 1909, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Roy L. Jones Truck Line v. Johnson, 1949 (Tex.Civ.App., Galveston), 225 S.W.2d 888, writ ref. n. r. e.; Shannon v. Western Indemnity Co., 1924 (Tex.Com. App.), 257 S.W. 522; Insurors Indemnity & Insurance Co. v. Pridgen, 1949, 148 Tex. 219, 223 S.W.2d 217; Stallcup v. United Gas Public Service Co., 1938 (Tex.Civ.App., Forth Worth), 119 S.W.2d 574, and cases

there cited. (In examining the Shannon v. Western Indemnity Co. and Insurors Indemnity & Insurance Co. v. Pridgen cases it should be borne in mind that the Texas Workmen's Compensation Law was involved and that rules applicable in connection with a determination of whether an injured plaintiff was an employee, etc., are somewhat more generous to the injured employee than is true in ordinary tort cases.)

While on the trial from which the instant appeal has been taken the evidence does not show applicability of principles of law discussed in American Nat. Ins. Co. v. Denke, 1936, 128 Tex. 229, 95 S.W.2d 370, 107 A.L.R. 409, an acquaintance therewith by all concerned might be helpful in the event the developments on further trial should create a necessity for their consideration.

■ Since Pangborn had plead in the nature of an affirmative defense in such a way as to entitle it, under the evidence, to have an issue submitted inquiring whether Carbaugh was the agent, servant, and/or employee of plaintiff's employer at the time of plaintiff's injury, acting within the scope and course thereof, we are furthermore of the opinion that the trial court erred in refusing Pangborn's specially requested issue which posed an inquiry thereon.

A part of the theory of plaintiff's case depended upon the finding that the partition plate which was being brought into proper position where Carbaugh and the employee of General Engineering would guide and drift it into position by use of their hands,— either struck against the channel iron, knocking it loose,—or struck against some other part of the structure, jarring the same so that the channel iron was caused to fall. Incident thereto and dependent upon the fact that such did occur was the alleged negligence on the part of Carbaugh, because of which plaintiff was predicating his claim of Pangborn's liability. In other words, if such an event did not occur Pangborn could not be liable for plaintiff's injury under the theory to which plaintiff was committed by his pleadings.

■ Carbaugh's negligence was alleged to have consisted in his failing to guide the partition plate, in failing to keep a proper lookout for the partition plate and for the safety of the plaintiff, in failing to give proper signals for the positioning of the partition plate, in failing to warn plaintiff that the plate was about to be positioned, and in failing to keep the channel iron on the "clip angle" as the plate was being positioned. Whether or not the partition plate hit anything, in particular the channel iron itself (thereby causing its fall), was a disputed issue under the evidence. The same thing is true relative to whether it was Carbaugh who was giving the signals to direct the movement of the partition plate by the crane operator. No issue was submitted by answer to which either of these questions was resolved. Pangborn objected because of the absence of the issues on the ground that the court, in submitting the other issues mentioned, assumed that the partition plate had struck the channel iron and that it was Carbaugh who was giving signals. We believe that reversible error is present in view of Pangborn's objection. T.R.C.P. 274, "Objections and Requests", and T.R.C.P. 279, "Submission of Issues"; Yellow Cab and Baggage Company v. Green, 1955, 154 Tex. 330, 277 S.W.2d 92.

Other errors assigned by Pangborn relative to conduct of the trial, or relating to the liability phase of the case, we deem without merit. At least this is true in the state of the record as developed in the trial court. We overrule these points of error. We see no occasion to lengthen this opinion by a discussion.

In view of our disposition, already indicated, we have decided not to pass on Pangborn's point of error asserting excessiveness in the award of damages.

Judgment is reversed and the cause remanded for another trial.