Thomas D. MOORMAN, Administrator of the Estate of Helen Mar Hunnicutt, Deceased, et al., Appellants,

v.

AUSTIN NATIONAL BANK, Independent Executor of the Will of Hicklin P. Hunnicutt, Deceased, et al., Appellees.

No. 11225.

Court of Civil Appeals of Texas.

Austin.

July 29, 1964.

Rehearing Denied Aug. 19, 1964.

R. C. Wilson, Cofer, Cofer & Hearne, Austin, for appellants.

Graves, Dougherty, Gee & Hearon, William L. Garwood, Alvis & Carssow, Powell, Rauhut, McGinnis & Lochridge, R. Harry Akin, J. H. Crook, Austin, for appellees.

HUGHES, Justice.

This controversy is between beneficiaries under the will of Hicklin P. Hunnicutt, and their successors in interest, and principally concerns the disposition to be made of 1000 acres of land in Dimmit County owned by the testator at the time of his death.

Hicklin Prescott Hunnicutt died in Austin, Travis County, Texas, April 16, 1953. He left a holographic will dated January 5, 1944, and a holographic codicil dated March 15, 1948. This will and codicil were

duly probated in Travis County May 26, 1953, and, as authorized by the will, the Austin National Bank qualified as Independent Executor of his estate.

Under this will the testator left to his half brother, Thomas B. Clark, the sum of $5000.00 or so much of that amount as might be realized from the sale of certain bonds. Also bequeathed to Mr. Clark were two gold watches, personal effects and a city lot in Stanford, Texas.

The testator devised and bequeathed to Helen Mar Hunnicutt, described in his will as "my adopted daughter," his one half interest in his present house in Austin, Texas, and all appurtenances "standing thereon" and all household effects therein. Testator also bequeathed to Helen Mar Hunnicutt all the shares of the capital stock of the Austin National Bank which he owned at the time of his death; also one H. O. L. C. Bond in the sum of $1000.00.

The inventory filed in testator's estate reflects that he owned 200 shares of capital stock in the Austin National Bank and that its value was $18,000.00. The value of the one half interest in the home place is shown by the inventory to be $10,000.00. The H. O. L. C. Bond, referred to in the will is not listed in the inventory.

Item 5 "and Proviso relative to item 5" of the will and the codicil form the basis for this controversy and will be set forth in full. Before doing so, however, reference is made to Item 6 of the will in which it is stated that "the foregoing five items of this written will dispose of all of my estate except three small pieces of property which are not therein appropriated." After describing such property, the will directed that they be sold by the executor and the proceeds used to pay testator's debts and expenses, the remainder to be divided equally between Mr. Clark and Helen Mar Hunnicutt.

Item 5, the proviso and the codicil follow:

"Item 5—I own a share amounting to one-half of a tract of two thousand acres of land located in the extreme northern part of the Blas Reyes eleven league grant of land in Dimmit County, Texas. Helen Mar Hunnicutt owns the other one-half of this same tract of two thousand acres. I anticipate that when she and I will divide the said tract between ourselves I will become owner of the northern one-half and she the southern.

"It is, therefore, my will and desire, and I accordingly direct my executor to extend to Helen Mar Hunnicutt the option to purchase for herself and in her own name all of my one-half interest in the said tract of two thousand acres located in Dimmit County, Texas, it being the northern part of the Blas Reyes grant of eleven leagues, for a total cash consideration of Six Thousand dollars ($6,000.00) to be paid to my executor within the period one year from the date of probate of this my will. If she elects to exercise the said option so extended to her, and shall pay that sum of money to my Executor herein named, he is hereby directed to proceed at once with the distribution of that sum of money in the manner which I here describe as follows:—

"The amount for each beneficiary is set opposite the name.

The Austin Presbyterian Theological Seminary, Austin, twenty per cent.
The First Southern Presbyterian Church, Austin, twenty per cent.
    to be applied on the debt against its physical property.
The Board of Trustees of Shriners Hospitals for Crippled
    Children, Endowment Fund; (Philadel.) ten per cent.
Texas Scottish Rite Hospital for Crippled Children
    (Dallas) ................................................ ten per cent.

Masonic Orphans Home, Ft. Worth, Tex................ five per cent.
Masonic Home at Arlington, Texas ..................... five per cent.
Eastern Star Home at Arlington, Texas ................ five per cent.
Austin Chapter of Boy Scouts ........................... five per cent.
Austin Chapter of Girl Scouts .......................... five per cent.
Austin Chapter of American Red Cross ................. five per cent.
Executor's fee for distribution ......................... five per cent.
Children's Home of Austin, Texas ..................... five per cent.

\* \* \* \* \* \* \* \* \* \* \* "

Proviso relative to Item 5—

"In the event that Helen Mar Hunnicutt shall fail to exercise the option offered her in Item 5 above by reason of her death or some providential hindrance, then my executor shall sell all my interest in the two thousand acre tract of land in Dimmit County by first advertising it in a newspaper for sale; and shall specify in the advertisement that a royalty of one-sixteenth will be retained by the vendor on all mineral, oil and gas that in future time may be developed within the land. The deed to be executed and delivered to the successful bidder shall carry the one-sixteenth mineral-right clause in favor of the Austin Presbyterian Theological Seminary of Austin, Texas.

"If all bids received should, in the judgment of my executor, appear unsatisfactory to him, he may postpone effort at sale and wait for a more favorable market value on the land. When the sale shall be completed and the money delivered into the possession of the executor, he shall segregate Six Thousand Dollars ($6,000.00) with which to satisfy and pay off the percentage legacies designated in the list of legatees in Item 5 above. Then, after first paying all bills of expenses, my executor shall distribute the remainder over in the manner as follows:—

Austin Presbyterian Theological Seminary                    70 per cent.
Fund for aid to aged retired preachers, Southern Presbyterian, 20 per cent.
Board of Trustees, Scottish Rite Dormitory, Austin, Texas,    10 per cent."

## CODICIL

"The intent and purpose of this Codicil is to change and increase the amount of cash money which Helen Mar Hunnicutt is to pay, according to said Will dated January 5, 1944, to my Executor for one thousand acres of land out of the Blas Reyes grant situated in Dimmit County, Texas, about six miles east of Carrizo Springs, from six thousand dollars ($6000.00) as expressed in the said Will to the sum of eight thousand ($8000.00) dollars; and also to authorize my Executor to augment the said sum of eight thousand ($8000.00) dollars to the sum of Ten Thousand ($10000.00) dollars by using a portion of my undesignated E bonds not already appropriated in my Will. My Executor will then proceed to distribute the sum of ten thousand (10000.00) dollars according to the schedule described in Item No. 5 of my said Will of January 5, 1944.

"In testimony whereof I have hereto affixed my written signature on this 15 day of March 1948."

Helen Mar Hunnicutt died in Blanco County, Texas, March 13, 1954.

On April 30, 1954, the administrator of the estate of Helen Mar Hunnicutt tendered

to Austin National Bank as Executor of the Estate of Hicklin P. Hunnicutt the sum of $8000.00 in cash in payment of the amount required of her by the will of Hicklin P. Hunnicutt in order to obtain ownership of the 1000 acres of Dimmit County land referred to in the will,[1] and requested of the Executor a deed to the land.

The Executor Bank, being uncertain that its acceptance of such sum, for the purpose stated, was required of or authorized by it under the circumstances to be related merely received such money and holds it subject to the judgment of a Court of competent jurisdiction, and for the purpose of securing such judgment instituted this suit.

This case was tried to a jury which answered the following single issue submitted to it as follows:

"SPECIAL ISSUE NO. 1:

"Do you find from a preponderance of the evidence that the deceased, Helen Mar Hunnicutt, sometime between the probate of the will of Hicklin P. Hunnicutt and her own death elected to exercise the option extended to her by the will of Hicklin P. Hunnicutt to purchase his interest in the Dimmitt County tract of land?

"Answer 'Yes' or 'No.'

"Answer: NO

"By the phrase, 'elected to exercise,' as used in the foregoing issue, is meant any statement or statements made by Helen Mar Hunnicutt to Bronson C. Turner, if any which communicated to him her then existing intention, if any she had, and her then definite decision, if any she had made, to purchase the land in question and to pay the $8,000 in cash within one year from the probate of the will of Hicklin P. Hunnicutt."

Based on this verdict, judgment was rendered that "Helen Mar Hunnicutt did not

elect to exercise the option to purchase the Dimmit County land * * * and that such option was not exercised by Helen Mar Hunnicutt and was not exercisable and exercised by * * *" the administrator of her estate, "or by anyone else," and all relief based on the exercise of such option was denied.

The only person who, as far as the record discloses, had any communication with Miss Hunnicutt regarding the option given her by the will of Hicklin P. Hunnicutt to acquire the 1000 acres of land in Dimmit County for $8000.00 was Mr. Bronson Turner, trust officer for the Executor Bank and who was authorized by it to act for it as Executor of this Estate.

There is no evidence that Miss Hunnicutt performed any act, other than by speaking, which would indicate that she did or did not exercise her option to purchase this land.

■ Since appellants assert there was no evidence to support the finding of the jury and since some of appellees assert there was no evidence to support a contrary finding by the jury, we will recite all of the testimony given by Mr. Bronson, in which he testifies to what Miss Hunnicutt said, or did not say, regarding this option.

"Q If you have stated that during her lifetime that Helen Mar Hunnicutt discussed with you an option extended to her by the will of Hicklin P. Hunnicutt, then state as well as you can how often you discussed this with her and, as best you recall, what was said.

"A I remember discussing the option with her on two or possibly more occasions. Each time in the discussion she stated that she wished to exercise the option but that she did not have the available cash at that time.

* * * * * *

1. The 2000 acre tract of land in Dimmit County had been partitioned, Mr. Hun-  nicutt obtaining the north 1000 acres and Miss Hunnicutt the south 1000 acres.

"A   Miss Hunnicutt did not inform me in writing or otherwise that she had decided to purchase the Dimmit County land under the option provisions of the will. She indicated to me on two or more occasions that she wanted to purchase the land but did not have the available cash to do so at the time.

\*   \*   \*   \*   \*   \*

"Q   What, if anything, did Helen Mar Hunnicutt ever tell you as to whether she was able to exercise the option which may have been granted her under the will of Hicklin P. Hunnicutt?

"A   Each time it was discussed she stated that she did not have the available cash at the time to exercise the option.

"Q   If you have stated that Helen Mar Hunnicutt has told you anything with respect to her ability to exercise the option, then what did she tell you in this regard?

"A   All Miss Hunnicutt told me at the times we discussed the option was that she did not have the available cash.

\*   \*   \*   \*   \*   \*

"Q   (By Mr. Cofer) All right, sir. I am going to ask you some questions and ask you if that is not substantially, Mr. Turner, what occurred. You offered to Helen Mar Hunnicutt, as specified in the will, the opportunity of exercising this option?

"A   Yes, sir.

"Q   And she told you that she would take the property?

"A   That she wanted to take the property.

"Q   All right. She wanted. She didn't say she would take it? She said she wanted to take it?

"A   No, sir, she did not say that she would take it.

"Q   She did not say that she would take it?

"A   No, sir.

"Q   She said she wanted to take the property?

"A   Correct.

"Q   Is that right?

"A   Yes, sir.

\*   \*   \*   \*   \*   \*

"Q   Now, Mr. Turner, in any of the conversations that you had with Helen Mar Hunnicutt, state whether or not that she told you that she elected to take the option?

"A   She never used the word, 'elected.'

"Q   Did she state whether or not, in any of these conversations, she told you that she accepted the option in the will?

"A   No word to that effect.

"Q   State whether or not that she ever said anything or did anything more than to tell you that she wanted to exercise the option.

"A   That is correct.

"Q   Did Helen Mar Hunnicutt ever discuss with you—I will ask you you this, Mr. Turner. State whether or not Helen Mar Hunnicutt told you that she didn't know where she would get the money to exercise the option.

"A   She never made such a statement.

"Q   Well, what statement did she make with reference to the money?

"A   The only statement that she made to me was that she did not have the available cash.

\*   \*   \*   \*   \*   \*

"Q   And you are sure you called her attention to the fact that it didn't make any difference if she didn't have the money then. She had within—twelve months within which to pay it?

"A   Correct.

"Q Yes, sir. Now, is it fair to say that it was your definite impression at that time and all times that you talked to her about it, that she desired and intended to exercise the option within the twelve-months period and pay the money?

"A Yes, sir.

"Q Do you think you told her, Mr. Turner, that all that remained to be done was to pay the money?

"A I do not recall having used such language.

"Q You don't say that you didn't tell her?

"A I wouldn't say that I didn't, no, sir.

\* \* \* \* \* \*

"Q State whether or not Helen Mar Hunnicutt ever informed you or the bank, in writing or otherwise, that she had decided to purchase the Dimmit County land under the option provisions of the will.

"A Miss Hunnicutt did not inform me in writing or otherwise that she had decided to purchase the Dimmit County land under the option provisions of the will. She indicated to me on two or more occasions that she wanted to purchase the land but did not have the available cash to do so at the time.

"Q State whether or not Helen Mar Hunnicutt ever informed you or the bank in writing or otherwise that she would take the Dimmit County land which Hicklin P. Hunnicutt owned.

"A No.

"Q State whether or not Helen Mar Hunnicutt ever informed you or the bank that she exercised her option under the will, either in those words or words of like meaning, and if she did so inform you or the bank, please give as near as you can, the words used.

"A Miss Hunnicutt did not express to me that she exercised the option that was given to her under the will.

"Q What, if anything, did Helen Mar Hunnicutt ever tell you as to whether she was able to exercise the option which may have been granted to her under the will of Hicklin P. Hunnicutt?

"A Each time it was discussed she stated that she did not have the available cash at the time to exercise the option.

"Q If you have stated that Helen Mar Hunnicutt has told you anything with respect to her ability to exercise the option, then what did she tell you in this regard?

"A All Miss Hunnicutt told me at the times we discussed the option was that she did not have the available cash.

"Q Did Helen Mar Hunnicutt during her lifetime ever pay or offer to pay any money to The Austin National Bank in connection with the option contained in the will of Hicklin P. Hunnicutt?

"A No.

"Q Did Helen Mar Hunnicutt ever discuss with you any financial arrangements for the sum of money or any part thereof, necessary to purchase the land covered by the option in the will of Hicklin P. Hunnicutt?

"A No.

\* \* \* \* \* \*

"Q All right. So she told you she wanted to take the property, but did not tell you that she would take the property?

"A Correct.

\* \* \* \* \* \*

"Q She never told you she definitely would take this property and pay the $8,000 to the bank did she?

"A She never told me definitely."

In addition to this testimony, the only other statements on this subject attributed to Helen Mar Hunnicutt came by way of Mr. E. Wayne Thode, testifying to a conversation with the trust officer Mr. Turner. At the time of this conversation, Mr. Thode was an attorney for the administrator of the Helen Mar Hunnicutt estate. We quote Mr. Thode:

"Q What, if anything, did the then administrator of the Estate of Helen Mar Hunnicutt do with reference to said option provision in the will of H. P. Hunnicutt?

"A The first action taken was to make inquiry from The Austin National Bank, the Executor of the Estate of Hicklin P. Hunnicutt, as to whether or not the option had been exercised. I was referred to Mr. B. C., or Mr. Bronson C. Turner, the Trust Officer and official acting for the bank as Executor of the Estate of Hicklin P. Hunnicutt. Mr. Turner informed me that he had made the offer to Helen Mar Hunnicutt, as specified in the will, and and that she told him she would take the property, but that she had not paid the amount specified in the will and codicil — $8,000.00 — before her death,

\* \* \* \* \* \*

"A \* \* \* I said to him 'Mr. Turner, didn't she tell you, when you offered her the option under the terms of the Hicklin P. Hunnicutt will, that she would take the 1000 acres? \* \* \*' Mr. Turner replied, 'Helen informed me, when

I asked her, that she would take the property \* \* \*.'

\* \* \* \* \* \*

"A \* \* \* In substance he [Mr. Turner] made that same statement to me during each of our conversations about this matter, that is, that he offered her the option under the terms of Hicklin P. Hunnicutt's will, and that she told him she would take the property, \* \* \*"

Miss Hunnicutt was a reserved, quiet, shy individual, not very talkative, who had devoted her life to teaching and scholarship. At the time of her death and for some years before, she was a Spanish translator at the Archives of the University of Texas. She was extremely frugal.

Miss Hunnicutt had been informed by Mr. Turner that the 1000 acres of land which she was given the privilege of purchasing had been appraised for estate purposes at $25.00 per acre.[2] This 1000 acres and the 1000 adjoining acres which Miss Hunnicutt owned in her own right had been leased for grazing and surface purposes for several years for a total rent of $2500.00.

The inventory of Miss Hunnicutt's estate and other testimony showed that at her death Miss Hunnicutt had a checking account of $3,800.00 and a savings account of $4,700.00 in the Austin National Bank and over $10,000.00 in U. S. Bonds. She also had 309 shares in the Austin National Bank valued at $20,000.00.

Appellants filed motions for an instructed verdict and for judgment notwithstanding the verdict of the jury. The Court's action in overruling these motions is the basis of appellants' first two points. It is our opinion that they should have been granted and we sustain appellants' first two points.

When we examine closely what Mr. Turner testified that Miss Hunnicutt said regard-

2. There is evidence to the effect that this land was worth $35,000.00 at testator's death.

ing the option in the will as distinguished from what she did *not* say, we find that one thought, and only one thought, clearly emerges. She "wanted" the land. There is not the slightest intimation from Miss Hunnicutt that she did *not* want the land. To say, as some appellees say that the use of the word "want" by Miss Hunnicutt is mere precatory language, to express a desire or a wish, is to attribute to Miss Hunnicutt a lack of intelligence and a childishness which the record refutes. Miss Hunnicutt was an educator. She was on the original staff of A and I College at Kingsville. She was a Spanish translator. She had lived a scholarly life. She was very careful with her money. She was very saving.

Miss Hunnicutt had been furnished with a copy of the will and had, presumably, read it. Mr. Turner had explained the option to her. She knew, peradventure of any doubt, that she had to pay $8000.00 for the 1000 acres in order to receive it. She repeatedly referred to the financial requirement. She also knew that this was an advantageous bargain. She knew that the 1000 acres was renting for $1250.00 per annum, a 10% return, less taxes, on a $12,500 value, a 5% return on a valuation of $25,000.00. She knew the land was appraised for $25,000.00 She knew, as everyone knows, that land, the surface, does not depreciate. She knew, as everyone knows, that the general trend of land values is up.

To say that Miss Hunnicutt would not appreciate and seize the opportunity granted to her by the will is unrealistic and would convict her of acting contrary to her frugal nature. Webster states that the word "frugal," in an economic sense, implies "the use of money or resources to the best advantage." Webster Int. Dictionary, 2d. ed., unabridged. There is nothing in this record to indicate that Miss Hunnicutt could have used $8000.00 to better advantage than to acquire this 1000 acres. As for her saving bent, first there must be something to save.

The will reflects that the testator did not contemplate that Miss Hunnicutt would voluntarily refuse to pay $8000.00 for the 1000 acres. He provided an alternative only in the event she failed to exercise the option "by reason of her death or some providential hinderance." This language clearly implies that the testator believed that the option granted Miss Hunnicutt was beneficial to her and was in the nature of a gift and not a commercial transaction or sale. If the form of the will had been a devise of the 1000 acres subject to a charge of $8000.-00, then there would have arisen a presumption that the bequest was beneficial and that she had accepted it. See Annotation 93 A.L.R.2d 8; 96 C.J.S. Wills § 1149a, p. 944.

The negative testimony in the record as to what Miss Hunnicutt did *not* say regarding the option is, in our opinion, of no probative force. Miss Hunnicutt was not called upon to say anything. She had no duty to speak. She had the privilege of saying what she pleased about this option. She had the privilege of saying nothing. If what she said amounted to an acceptance of the offer in the will, what she did not say should not have the effect of destroying what she did say. The words which Miss Hunnicutt did not say about this option could be piled up almost ad infinitum. Did she say for "certain" she would take the land? Did she say "positively" that she would buy the land? Did she say "unequivocally" that she elected to exercise her option to purchase the land? Multiplied a thousand fold, this is no evidence that she did not accept or exercise the option and detracts not one whit from what was said.

Miss Hunnicutt was constant in expressing her intent regarding this option or the land it represented. This intent is unmistakable. It was to take the land. The words she used to express this intent were layman's words. She "wished" to exercise her option. She "wanted" to take the property. Nevertheless, they have a single meaning.

We hold that under the evidence Miss Hunnicutt, as a matter of law, accepted testator's offer to permit her to purchase the 1000 acres for $8000.00 to be paid as provided in the will. We also hold that considering only the evidence favorable to the verdict and indulging in all intendments in that behalf there is no evidence of probative force to sustain the verdict, and that this is a matter about which reasonable minds cannot differ.

■ Miss Hunnicutt did not, herself, pay the $8000.00 required by the will, her death intervening. This sum was paid by her administrator within the time fixed by the will. We hold that such payment satisfies the requirement of the will.

Miss Hunnicutt stated that "she did not have the available cash *at that time*" (Italics added) in discussing the option with Mr. Turner.[3] There is no finality in this statement. In fact, it recognizes the temporary lack of, not money, but "available" money. Clearly, it seems to us, Miss Hunnicutt had in mind, in due time, making the $8000.00 available, and paying it for the land.

There is nothing in the will compelling simultaneous acceptance of the offer to buy and payment of the money. The acceptance of the offer would imply the promise to pay but payment might be deferred for a year after probate of the will. This distinction between an election to exercise an option and performance by the optionee is recognized in James on Option Contracts (1916) Sec. 839, from which we quote:

"Election and Performance Distinguished. Election, as we have seen, is the act which converts the option into a binding promise on the part of the optionor to sell. In a very broad sense it is an act of performance, but a performance which is optional with the optionee. The performance we now have in mind is one which grows out of the election and thus becomes obligatory upon the optionee. As thus viewed the distinction between election and performance is apparent, since the former has to do with the creation of the contract and the latter with the fulfillment of the terms of the contract after its creation."

This authority also states, Sec. 1241, that, "Where the optionee dies after election, the devisee under his will may maintain suit for specific performance."

In 3 Williston on Contracts, Revised Edition, Sec. 853, this pertinent discussion is made:

"Though the condition as to time must be strictly complied with, a distinction should be noted: If the option offers a unilateral contract, then performance must be tendered within the stated period, whereas, if it offers a bilateral contract, while acceptance must be made within the time fixed, performance need not necessarily be begun or completed so promptly in the absence of controlling stipulations in that respect. But an option may require both that notice of intention to exercise the option be given within a specified time and also that the performance be rendered by a certain date. In such a case failure to give such notice on time is fatal, as subsequent failure to render performance seasonably would also be."

■ Our own Courts have considered the acceptance of an option as separate from performance by the optionee where permitted by the terms of the option. In Lambert v. Taylor Telephone Cooperative, Inc., 276 S.W.2d 933, Eastland Civ.App., it is stated:

"Appellee, as required by the contract, notified appellant in writing of its exercise of the option. This is all that is required by the contract to effect an

---

3. Mr. Turner also testified, "Each time it was discussed she stated that she did not have the available cash at the time to exercise the option."

acceptance. Of course, appellee was required to pay the purchase price, but payment was required only after delivery by appellant of the abstracts and deeds. In the absence of a provision to the contrary, payment is not necessary to effect an acceptance."

See also Wall v. Trinity Sand and Gravel Company, Tex.Sup., 369 S.W.2d 315, where it was held that acceptance of an option without payment of the consideration created a binding contract.

We hold that the $8000.00 payment timely tendered by the Administrator of the Helen Mar Hunnicutt Estate was made pursuant to a legal obligation of such estate.

Before leaving this phase of the case we desire to emphasize that we are expounding a will, not a business contract. While, as stated, the language used by the testator in the will created a formal option, yet from the entire will, the relationship of the parties and the attendant circumstances it is evident that the testator intended to bestow upon Miss Hunnicutt a substantial benefit and that a gift was in his mind to the extent that the value of the land exceeded $8000.-00.[4] In Taylor v. Sanford, 108 Tex. 340, 193 S.W. 661, the Court in considering the effect of an onerous deed not delivered before death of the maker said, "As a rule of reason and common sense, a delivered instrument plainly amounting to a deed of gift should operate by a presumed assent until a dissent or disclaimer appears." See also Mattern v. Herzog, Tex.Sup., 367 S.W.2d 312, where the Court very liberally construed an option in a will in order to carry out the intention of the testator and to achieve an equitable result. These authorities and those previously cited convince us that our disposition of this case is in accord with sound legal principles and that it is just.

The religious and benevolent institutions who will be disappointed by our decision and who may question its wisdom and justness should pause and reflect on what their judgment would be if Miss Hunnicutt instead of suffering a fatal illness on April 16, 1953, had been then rendered mentally inert and had remained so until now, the $8000.00 being timely tendered for her by her legal representative. If our present decision is wrong, it would also be wrong under the assumed facts.

Appellants' third and fourth points relate to procedural matters in submitting this case to a jury. Our ruling on the first two points renders these points immaterial. Appellants also have some alternative points which, under our ruling, become inapplicable.

Appellants' fifth point questions the manner, not the amount, in which the attorneys' fees, and expenses, other than simple Court costs which were assessed against appellants, have been assessed. The Court ordered these items, totaling $3,885.38, paid "according to the following priority:

"(a) From such portions of said funds as were derived from leases, rentals, interest or income other than that derived from the leasing of the property for oil, gas, and other minerals;

"(b) From such portion of said funds as were derived from delay rentals from the existing oil and gas lease;

"(c) From other available assets of the Estate of Hicklin Hunnicutt, deceased, now on hand."

4. Appellees, The Scottish Rite Educational Association of Texas and the Board of Annuities and Relief of the Presbyterian Church in the United States, in their brief say: "All this discussion leaves us with the problem originally facing us —construction of the option provision in the will of Hicklin P. Hunnicutt. Appellees urge that this problem is quite different from that of construing an option involved in a commercial transaction. We have an option created by will with obvious donative intent on the part of the testator.

Appellants do not brief this point except to state their position that the Court should exercise its discretion and assess the costs against the property and funds in dispute.

Appellees other than the Unknown Heirs of H. P. Hunnicutt, have no complaint about the manner in which costs, attorneys' fees and expenses were assessed and ordered paid, saying that the discretion of the Trial Court has not been abused in this respect.

The Unknown Heirs of H. P. Hunnicutt contend that under Item 6 of the will the three pieces of property there mentioned should be sold and, as the will provides, "use the money from the sales to pay off all debts and expenses that may remain to be paid by my estate."

The inventory of the H. P. Hunnicutt estate does not describe any of the items mentioned in this paragraph of the will. Presumably, they were not on hand when the testator died.

We are unable to detect any abuse of discretion by the Trial Court in ordering payment of attorneys' fees and expenses in the manner indicated. All ordinary Court costs, however, will abide the event and will be assessed against appellees other than the Austin National Bank, Executor.

We note from the record that certain features of this litigation, notably an accounting between the parties, have been severed for separate trial. Under these circumstances we believe the appropriate judgment herein is to reverse and remand this cause for further proceedings consistent with this opinion. We further direct that any final judgment herein be made subject to the administration of this estate by the Austin National Bank, Executor, in the event that at such time further administration is necessary.

The judgment of the Trial Court is reversed and this cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.